UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

NAKEISHA HARRELL,

     *Plaintiff,*

     v.

COHO FINANCIAL d/b/a PATH
LENDING, CLARITY SERVICES,
INC., THUNDERBIRD SERVICES,
LLC, *and* DENNIS GLEN MILKS,

     *Defendants.*

Case Number:

JURY TRIAL DEMANDED

## COMPLAINT AND DEMAND FOR JURY TRIAL

COMES NOW the Plaintiff, **Nakeisha Harrell** ("**Ms. Harrell**"), by and through her attorneys, Seraph Legal, P.A., and complains of the Defendants, **Coho Financial,** doing business as **Path Lending** ("**Path Lending**"), **Clarity Services, Inc.** ("**Clarity**"), **Thunderbird Services, LLC** ("**Thunderbird**"), and **Dennis Glen Milks** ("**Milks**") (collectively, the "**Defendants**"), stating as follows:

## PRELIMINARY STATEMENT

1.     This is an action brought by Ms. Harrell against Path Lending and Thunderbird for violations of the *Florida Consumer Collection Practices Act*, § 559.55, Fla. Stat., *et seq.* ("**FCCPA**") and the *Electronic Funds Transfer Act*, 15 U.S.C. § 1693, *et seq.* ("**EFTA**"), and against all Defendants for violations of the *Racketeer Influenced and Corrupt Organizations Act,* 18 U.S.C. § 1961, *et seq.* ("**RICO**") and

Florida's *Civil Remedies for Criminal Practices Act*, § 772.101, Fla. Stat., *et seq.* ("**CRCPA**").

## JURISDICTION AND VENUE

2.      Subject matter jurisdiction for Plaintiff's federal claims arises under the EFTA, 15 U.S.C. § 1693m(g), RICO, 18 U.S.C. § 1965, and 28 U.S.C. § 1331.

3.      This Court has supplemental jurisdiction for Plaintiff's state law claims under the FCCPA and CRCPA pursuant to 28 U.S.C. § 1367.

4.      The Defendants are subject to the provisions of this Court pursuant to § 48.193, Fla. Stat. and Fed. R. Civ. P. 4(k).

5.      Venue is proper in the Middle District of Florida pursuant to 28 U.S.C. § 1391(b)(2), because the acts complained of were committed and/or caused by the Defendants within the Middle District of Florida.

## PARTIES

### Ms. Harrell

6.      **Ms. Harrell** is a natural person residing in the City of Leesburg, Lake County, Florida.

7.      Ms. Harrell is a *Consumer* as defined by the FCCPA, § 559.55(8), Fla. Stat.

### Path Lending

8.      **Path Lending** is an online lender that offers loans to consumers at annual percentage rates in excess of 600% via its website, pathlending.com.

9. Path Lending claims to be chartered pursuant to the laws of the Guidiville Indian Rancheria (the "**Tribe**"), a federally recognized American Indian nation.

10. Path Lending claims to be a wholly owned economic arm and instrumentality to the Tribe.

11. Path Lending can be served at **621 Medicine Way, Suite 1, Ukiah, CA 95482.**

## Clarity

12. **Clarity** is a Delaware corporation with a principal business address of 475 Anton Blvd., Costa Mesa, CA 92626.

13. Clarity is registered to conduct business in the State of Florida, where its registered agent is **CT Corporation System, 1200 South Pine Island Rd., Plantation, FL 33324**.

## Thunderbird

14. **Thunderbird** is a Delaware corporation with a primary address of 2301 Burlington St., Suite 270, Kansas City, MO 64116.

15. The Delaware registered agent for Thunderbird is **Delaware and Yacht Registry, Ltd., 108 W. 113th St., Suite 105, Wilmington, DE 19801.**

<u>**Milks**</u>

16.     **Milks** is the owner of Thunderbird, and a natural person who, on information and belief, resides at **7615 N Donnelly Ave., Kansas City, MO 64158.**

<u>**FACTUAL ALLEGATIONS**</u>

<u>**Path Lending Makes Unlawful Loans to Plaintiff**</u>

17.     Beginning on or about January 14, 2016, Path Lending began making a series of loans to Ms. Harrell at interest rates which exceeded 600% annually.

18.     On or about January 14, 2016, Path Lending made a loan to Ms. Harrell in the amount of $100 (the "**First Loan**").

19.     The First Loan had a stated annual percentage rate of 733.45%.

20.     Ms. Harrell repaid more than $350 on the First Loan over a five-month period.

21.     On or about March 7, 2016, Path Lending made a loan to Ms. Harrell in the amount of $300 (the "**Second Loan**").

22.     The Second Loan had a stated annual percentage rate of 779.03%.

23.     Ms. Harrell repaid more than $1,052 on the Second Loan over a five-month period.

24.     On or about September 21, 2017, Path Lending made a loan to Ms. Harrell in the amount of $200 (the "**Third Loan**").

25.     The Third Loan had a stated annual percentage rate of 817.14%.

26.     Ms. Harrell repaid more than $701 on the Third Loan over a five-month period.

27.     On or about April 3, 2018, Path Lending made a loan to Ms. Harrell in the amount of $150 (the "**Fourth Loan**").

28.     The Fourth Loan had a stated annual percentage rate of 779.02%.

29.     Ms. Harrell repaid more than $526 on the Fourth Loan over a five-month period.

30.     On or about September 20, 2018, Path Lending made a loan to Ms. Harrell in the amount of $400 (the "**Fifth Loan**").

31.     The Fifth Loan had a stated annual percentage rate of 627.94%.

32.     Ms. Harrell repaid more than $600 on the Fifth Loan over a four-week period.

33.     On or about November 14, 2018, Path Lending made a loan to Ms. Harrell in the amount of $150 (the "**Sixth Loan**").

34.     The Sixth Loan had a stated annual percentage rate of 814.98%.

35.     Ms. Harrell repaid more than $526 on the Sixth Loan over a five-month period.

36.     On or about May 8, 2019, Path Lending made a loan to Ms. Harrell in the amount of $200 (the "**Seventh Loan**").

37.     The Seventh Loan had a stated annual percentage rate of 689.08%.

38.     Ms. Harrell repaid more than $701 on the Seventh Loan over a five-month period.

39.     On or about August 31, 2023, Path Lending made a loan to Ms. Harrell in the amount of $600 (the "**Eighth Loan**"). **SEE PLAINTIFF'S EXHIBIT A.**

40.     The Eighth Loan had a stated annual percentage rate of 781.26%. *Id.*

41.     Ms. Harrell repaid more than $900 on the Eighth Loan over a three-week period.

42.     Each of the aforementioned loans (collectively, the "**Loans**") were obtained through PathLending.com by Ms. Harrell from her home in Florida.

43.     Path Lending transferred the proceeds of the Loans through the *Automated Clearing House* ("ACH") network into Ms. Harrell's checking account which she maintained in Florida.

44.     Shortly after the Loans were taken out, Path Lending began debiting Ms. Harrell's checking account via the ACH network and withdrawing bi-weekly payments.

45.     The State of Florida has long recognized that lending money at usurious interest rates is immoral, harmful, and contrary to public policy.

46.     § 687.02(1), Fla. Stat., renders any loan usurious which is made at an interest rate greater than 18% per year.

47.     § 687.071(3), Fla. Stat., renders loans made with annual interest rates greater than 45% a third-degree felony.

48.     § 687.071(7), Fla. Stat., renders any criminally usurious loan void and unenforceable. *See also* § 516.02(2)(c), Fla. Stat. (rendering debts unenforceable that originated from usurious contracts).

49.     Long-standing public policy in Florida confirms the impossibility of the alleged debts. *Richter Jewelry Co. v. Schweinert*, 169 So. 750, 758-59 (Fla. 1935) (criminally usurious loans are "void as against the public policy of the state as established by its Legislature.")

50.     Any person who willfully makes a criminally usurious loan, in addition to subjecting themselves to criminal sanctions, forfeits the right to collect payment for the loan. *Id.*

51.     Indeed, even the recovery of the principal balance made at usurious rates is impermissible under Florida law. *Rollins v. Odom*, 519 So. 2d 652, 656 (Fla. Dist. Ct. App. 1988).

52.     The purpose of the usury statutes is to protect the needy borrower by penalizing the unconscionable money lender. *Stubblefield v. Dunlap*, 148 Fla. 401, 4 So.2d 519 (1941); *see also Pushee v. Johnson*, 123 Fla. 305, 166 So. 847 (1936); *River Hills, Inc. v. Edwards*, 190 So.2d 415 (Fla. 2d DCA 1966).

53.     Florida has taken usury one step further in the consumer loan context through the passing of the Consumer Finance Act, Chapter 516, Fla. Stat. (the "Act").

54.     The Act requires licensure and state oversight for lenders issuing loans to Florida consumers in the amount of $25,000 or less. § 516.02(1), Fla. Stat.

55.     The Act further restricts the interest and fees which may be charged by a licensed consumer finance company.

56.     § 516.02(c), Fla. Stat., indicates that any loan which fails to comply with the Act is unenforceable in Florida *even if valid wherever made.*

57.     Thus, Florida has made clear that in order to enforce a consumer loan against a Florida resident, a lender must be licensed in Florida and comply with the Consumer Finance Act.

58.     Ms. Harrell's Loans charged annual interest rates that vastly exceeded rates permitted by the Act.

59.     Path Lending is not licensed as a Consumer Finance Company in Florida.

60.     The Loans were thus unenforceable against Ms. Harrell, regardless of whether they were valid under tribal law or wherever else they may have been made.

61.     Further, because the Loans were subject to annual interest rates greater than 45%, which exceeds the limit as proscribed in § 678.071(3), Fla. Stat., the Loans were void *ab initio* and unenforceable in Florida, pursuant to § 687.071(7), Fla. Stat.

62. Thus, the Loans are *unlawful debts* pursuant to § 772.102(2)(a)(3), Fla. Stat., and 18 U.S.C. § 1961(6).

63. As the interest rates on Ms. Harrell's Loans vastly exceeded the maximum lawful interest rate in Florida, the making, and collection, of the Loans constituted a felony pursuant to § 687.071(3), Fla. Stat.

64. Thus, the Defendants engaged in a pattern of criminal activity against Ms. Harrell.

65. The proceeds from the Loans were used by Ms. Harrell for the purchase of goods and services for personal, family, or household purposes, and thus the Loans meet the definition of *Debt* under the FCCPA, § 559.55(6), Fla. Stat.

66. Path Lending made multiple collection communications to Ms. Harrell, via e-mail and text message over the past 24 months.

67. Path Lending, directly or via service providers, reported the Loans to Clarity, a nationwide *consumer credit reporting agency* ("CRA"). **SEE PLAINTIFF'S EXHIBIT B.**

68. By reporting the Loans to a CRA, Path Lending certified that the Loans were legally valid debts, which they are not.

69. Path Lending reported multiple illegal, unenforceable debts to the CRAs in order to hold Ms. Harrell's credit report hostage, thereby ensuring payment of the usurious Loans.

70.     Reporting a debt to a CRA is an attempt to collect the debt alleged therein. See, e.g., *Edeh v. Midland Credit Management, Inc.*, 748 F. Supp. 2d 1030 (D. Minn. 2010) ("The Court has learned, through its work on countless [Fair Debt Collection Practices Act] cases, that threatening to report and reporting debts to CRAs is one of the most commonly-used arrows in the debt collector's quiver.")

71.     As a result of Path Lending's actions, Ms. Harrell was strong-armed into paying the Loans; had she not done so, her credit reports and scores would be adversely impacted.

### Rent-A-Tribe Schemes

72.     Path Lending is a purportedly tribal lending entity owned and operated by the Guidiville Indian Rancheria (the "Tribe"), which issues short-term, high-interest-rate loans via its website, pathlending.com

73.     In reality, the Tribe has virtually nothing to do with the operation of the lending business and simply participates in what is often referred to as a "rent-a-tribe" scheme.

74.     In such a scheme, non-tribal payday lenders attempt to circumvent state usury laws by invoking the sovereign immunity available to Native American tribes.

75.     While the non-tribal entities operate all substantive aspects of the business such as funding, marketing, loan origination, underwriting, loan servicing, electronic funds transfers, and collections for the high-interest loans, the

tribe acts as a label or figurehead in exchange for what is often a relatively insignificant portion of the revenue generated.

76.     The Tribe is a remote, isolated Native American tribe with approximately 100 members living on its reservation totaling less than 50 acres near Ukiah, California.

77.     The Tribe was federally recognized in 1992 and has no significant assets such as casinos, gas or oil, etc.

78.     Facing limited economic prospects, the Tribe attempted to profit by utilizing one of its few assets – "renting" its sovereign immunity to lending entities seeking to "partner" with tribes to attempt to avoid state usury laws.

79.     Around 2010, it published a "Tribal Lending Regulatory Ordinance" which was written for the Tribe by outside attorneys representing the interests of online payday lenders seeking to "partner" with the Tribe to engage in "rent-a-tribe" lending schemes.

80.     Supposedly, Path Lending operates under a lending license granted by the Tribe, beholden only to the Tribe's own "Tribal Lending Regulatory Ordinance."

81.     Of note, the Tribe's lending ordinance does not require a person obtaining a license to be a Tribal member, nor does it require any particular percentage of revenue to be retained by the Tribe.

82.     The initial "rent-a-tribe" scheme the Tribe engaged in was with Charles Hallinan, a Pennsylvania businessman often referred to in the press as the "Godfather of Payday Lending" as he had been active in the business since the early 1990s.

83.     The Tribe served as the sham owner of lending businesses such as Hamilton Liberty, Tribal Consumer Lending, and BestChoice123.com.

84.     Hallinan ran a scheme in which the Guidiville Tribe claimed to be the owner of several different payday lending enterprises but were run entirely by Hallinan's non-tribal businesses.

85.     Federal prosecutors later alleged Hallinan raked in $3 million per month from the schemes, with the cut to the Tribe in the tens of thousands per month.

86.     The notion that loans were made on the Tribe's reservation stemmed from nothing more than a server Hallinan placed in an empty cargo container on the Tribe's land, telling the Tribe the server ran software which approved loan applications.

87.     In reality, the server was an empty box not even connected to the internet.

88.     In 2016, Hallinan was arrested and charged with racketeering, mail fraud, wire fraud, money laundering, aiding and abetting, and other crimes, all of which directly related to his payday lending empire and lending business

supposedly owned by the Tribe; Hallinan is currently incarcerated in a federal prison, and has been serving a 16-year sentence since his 2017 conviction. He was also fined $64 million.

89.     Online tribal lending is considered "off-reservation" conduct. *Hengle v. Treppa*, 19 F.4th 324, 348-49 (4th Cir. 2021).

90.     Unsurprisingly, none, or virtually none, of Path Lending's business is conducted on the Tribe's reservation.

91.     Rather, all essential business operations are performed in other locations outside of the Tribe's jurisdiction.

92.     PathLending.com operates from an IP address of 75.8.211.19, which corresponds to a physical location near Walnut Creek, California, near San Francisco and more than 130 miles from the Tribe's reservation.

93.     Off-reservation business operations, compromising substantially all of the company's functions, are conducted by and for the benefit of non-tribal members and investors.

94.     These operations include incoming and outgoing phone calls and emails, review of loan applications, loan underwriting, payment processing, website maintenance, and marketing.

95.     Ms. Harrell has never set foot on Tribal land or visited Ukiah, California.

96.     Like virtually all consumers who obtain a loan from Path Lending, Ms. Harrell did so from her home, which in her case was in Florida.

97.     Ms. Harrell took the loan out from her home in Florida, had the proceeds wired to her checking account she maintains in Florida, signed all relevant documents in Florida, received loan communications in Florida, and had payment debited from her checking account at a Florida bank.

98.     Having no nexus with the Tribe or its land, and having been obtained, funded, and paid in Florida, Ms. Harrell's Loans from Path Lending occurred in Florida and are governed by the laws of the State of Florida.

99.     Moreover, sovereign immunity does not turn an otherwise illegal loan into a legal one; at best, it potentially creates a defense to criminal or civil prosecution of the crime. *See, e.g.*, *United States v. Neff*, No. 18-2282 (3d Cir. Sep. 6, 2019) (upholding criminal convictions of two individuals engaged in an online payday lending rent-a-tribe scheme; sovereign immunity does not transform illegal loans into legal ones, and "reasonable people would know that collecting unlawful debt is unlawful").

100.    Where a consumer is located when they press "submit" via an online portal with a Native American tribe determines where the transaction takes place for jurisdictional purposes.[1]

---

[1] *California v. Iipay Nation of Santa Ysabel*, 898 F.3d 960, 968 (9th Cir. 2018) ("However, the patrons' act of placing a bet or wager on a game of DRB while located in California constitutes gaming activity that is not located on Indian lands, violates the UIGEA, and is not protected by IGRA.")

101.   Courts have recognized that the consumer's location when a particular transaction occurred is relevant for jurisdictional determinations. See *Otoe-Missouria Tribe of Indians v. New York State Department of Financial Services* 769 F.3d 105, 115 (2d Cir. 2014) ("…the borrower seeks the loan without ever leaving the state, and certainly without traveling to the reservation. Even if we concluded that the loan is made where it is approved, the transaction . . . involves the collection as well as the extension of credit, and that collection clearly takes place in New York. The loan agreements permit the lenders to reach into the borrowers' accounts, most or all of them presumably located in New York.")

102.   As such, the loans made to Ms. Harrell by Path Lending Loans were criminally usurious, void, unenforceable and unlawful debts.

### **Thunderbird's Role in Path Lending's Racketeering Conspiracy**

103.   Thunderbird "provides consulting services to Native American Indian Tribes in the areas of Accounting, Information Technology, Operations Management and Federal Consumer Lending Compliance," according to its profile on LinkedIn.[2]

104.   Around April 8, 2012, PathLending.com was registered; archived Domain Name Registration records show PathLending.com was registered to Dennis Milks of Paycrom Holdings, Ltd.

---

[2] https://www.linkedin.com/company/tbirdsvcs?trk=public_profile_topcard-current-company, accessed July 15, 2024

105.   Paycrom Holdings, Ltd. is a shell company purportedly based in the Isle of Man, United Kingdom.

106.   Previously, Milks was a senior technology advisor at Evergreen Capital Partners, one of the plethora of businesses run by Scott Tucker ("Tucker") in Kansas City.

107.   Tucker's companies made loans to over 4.5 million Americans at interest rates typically exceeding 700% annually, and collected over $3.5 billion in revenue through numerous rent-a-tribe schemes.[3]

108.   Milks later incorporated Thunderbird, which was also based in the Kansas City area; this entity was one of the several non-tribal entities which beneficially operates Path Lending and receives the overwhelming percentage of profits Path Lending produces.

109.   Despite having less than 100 members living on its reservation, the Tribe claims to operate multiple successful lending enterprises, including The Loansmith, Tan Oak Lending, and Elevation Loans.

110.   All of the Tribe's lending operations are rent-a-tribe schemes; The Loansmith, which operates from Loansmith.com, is operated by non-tribal persons and entities including Bart Miller and Centrinex, LLC, a company based near Kansas City which provides services to multiple online payday lenders.

---

[3] In October 2017, Tucker was convicted of racketeering and sentenced to 16 years and 8 months in a federal prison; Tucker is currently incarcerated.

## Clarity Knowingly Facilitates Loansharking

111.   Clarity is a nationwide CRA which primarily services the needs of online payday lenders like Path Lending – *e.g.*, lenders making short-term, small-dollar loans at triple-digit interest rates.

112.   Clarity maintains terabytes of proprietary data specifically tailored to assist online, subprime lenders in evaluating potential borrowers, including consumers' checking account histories, employment and salary data, and past payday loan experiences.

113.   Clarity then supplements this data with information from its parent company, Experian, one of the "Big 3" nationwide CRAs, as well as with data from other specialty CRAs, including Chex Systems.

114.   Clarity merges its own data with that obtained from Experian and Chex Systems into one report, which it then sells to online lenders.

115.   Prior to Path Lending making a loan to Ms. Harrell, in each and every instance, Clarity first sold a consumer report regarding Ms. Harrell to Path Lending. **SEE PLAINTIFF'S EXHIBIT B.**

116.   Clarity's consumer reports regarding Ms. Harrell were obtained by non-tribal service providers, including Thunderbird, among other entities, acting on behalf of the Path Lending enterprise.

117.   Clarity has extensive policies in place to conduct due diligence on potential new customers, which includes, in most cases, sending an investigator to the primary business office of the lender.

118.   In situations where a lender is "tribally" owned but obtains consumer reports through a non-tribal service provider, Clarity typically sends its investigator to the offices of the service provider, *e.g.*, to the offices of Thunderbird in Kansas City, not to the Tribe's reservation in California, where no lending office exists.

119.   Clarity also examines the states the lender does business in, and the lender's website, including pages which show the interest rates, terms, and fees assessed.

120.   Clarity has had numerous lawsuits filed against it concerning its provisioning of credit reports to online payday lenders with sham tribal affiliation, like Path Lending.

121.   Clarity has also produced several detailed reports for the online lending industry, such as its 2019 *Alternative Financial Services Lending Trends Insights into the Industry and its Consumers*, which it stated analyzed 350 million loan applications and 25 million loans. Most of the loans were small-dollar, short-term loans made by online lenders.

122.    Clarity thus knew, when furnishing a consumer report regarding Ms. Harrell, that the data it was providing was in connection with the making of a loan at a triple-digit interest rate.

123.    Clarity's assistance in Path Lending's "rent-a-tribe" scheme is of critical importance, as is that of Thunderbird and other non-tribal entities which provide working capital to fund loans and invest in the returns generated.

124.    Absent the trove of data Clarity knowingly supplied for use by Path Lending, no such loans could have, or would have, been made to Ms. Harrell.

125.    Beyond this, Clarity accepts tradeline data from Path Lending, which data includes loan amounts, payments due, and payment history.

126.    Indeed, Path Lending, via Thunderbird or some other non-tribal service provider, reported Ms. Harrell's Loans to Clarity.

127.    Clarity spends what is likely hundreds of thousands of dollars each year promoting itself and its services directly to online lenders like Path Lending.

128.    For example, Clarity was a "Gold Level" sponsor of the Online Lenders Alliance 2022 and 2023 Tribal Lending Conference; one of its employees, Paul Mitchell, a Senior Account Executive, was also a speaker at the conference and gave insights into what kind of consumers are likely to look for, and accept the terms of, with "tribal" payday lenders.

129.    Clarity also periodically receives disputes from consumers about Path Lending tradeline data, alleging the loans are usurious and unenforceable.

130.    For years, courts have recognized the power of credit reporting to procure payment. A creditor's "ability to report on the credit habits of its customers is powerful tool designed, in part, to wrench compliance with payment terms." *Rivera v. Bank One*, 145 F.R.D. 614, 623 (D.P.R. 1993).

## Path Lending Violates EFTA by Requiring Electronic Payment

131.    Ms. Harrell was required to provide her bank routing and account number or debit card number when she applied for the August 31, 2023 loan.

132.    Path Lending will not allow an application for credit to proceed without the consumer supplying bank account information. **SEE PLAINTIFF'S EXHIBIT C.**

133.    When Ms. Harrell was approved for the loan from Path Lending, she was provided with a "payment authorization" to electronically sign along with other electronic documents.

134.    The "payment authorization" gives consent to Path Lending to initiate ACH debits from her account (or debit card) to make the required bi-weekly loan payments.

135.    While couched as voluntary, Path Lending will not approve a loan application which does not contain a signed, "voluntary" electronic payment agreement.

136.    While a consumer like Ms. Harrell can elect to terminate the electronic payment agreement, such actions can be taken only *after* the loan is originated.

137.   Path Lending's business model of making unsecured subprime consumer loans is heavily predicated on being able to debit loan payments automatically on a bi-weekly basis – typically the schedule most consumers are paid their wages.

138.   The EFTA "protects consumers by providing a 'basic framework establishing the rights, liabilities, and responsibilities of participants in electronic fund transfer systems.'" *Bass v. Stolper, Koritzinsky, Brewster & Neider, S. C.*, 111 F.3d 1322, 1328 (7th Cir.1997) (quoting 15 U.S.C. § 1693(b)).

139.   "No financial institution or other person may condition an extension of credit to a consumer on the consumer's repayment by preauthorized electronic fund transfers...." 12 C.F.R. § 205.10(e)(1). *See also* 15 U.S.C. § 1693k(1).

140.   Thus, despite the ostensibly "voluntary" electronic payment agreement, in reality, Path Lending conditioned the loan on Ms. Harrell, like all other consumers it serves, providing consent to ACH debits or debit card payments.

141.   The fact that the agreement can be modified or altered after execution does not mean Path Lending complied with the EFTA.

142.   Violation of 15 U.S.C. § 1693k(1) occurs at the moment the lender conditions electronic funds transfers. *See De La Torre v. CashCall, Inc.*, 56 F. Supp. 3d 1105, 1107-09 (N.D. Cal. 2014); *Federal Trade Commission v. Payday Financial LLC*, 2013 WL 5442387, at *8-9 (D. S.D. Sept. 30, 2013).

**Defendants Violate RICO**

143.    RICO defines an "enterprise" as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4).

144.    In *Boyle v. United States*, the Supreme Court recognized that RICO's definition of enterprise was "obviously broad" and included an "association in fact" enterprise. 556 U.S. 938, 944 (2009).

145.    Thus, an enterprise may be a legally recognized entity like a corporation or an "association in fact enterprise," *i.e.*, "a group of persons associated together for a common purpose of engaging in a course of conduct." *United States v. Turkette*, 452 U.S. 576, 583 (1981); *Boyle*, 556 U.S. at 948 ("[A]n association-in-fact enterprise is simply a continuing unit that functions with a common purpose.")

146.    Here, Path Lending, Thunderbird, Clarity, Milks, and various other non-tribal entities are an *association in fact enterprise* who are associated together for the common purpose of making, collecting, and profiting from illegal loans, in some cases directly, and in others indirectly.

147.    Milks, in particular, created and registered the PathLending.com domain, set up and established Thunderbird to help facilitate the Path Lending rent-a-tribe scheme (and, likely, other similar schemes), and receives money

directly stemming from the collection of unlawful loans like those made to Plaintiff.

148.    The Path Lending enterprise has been making – and collecting – unlawful loans in Florida since 2014, and continues to make and collect unlawful loans as of the date of this filing.

149.    At all times relevant, all of the Defendants sought to serve the Florida market, as did Path Lending.

150.    Therefore, the Defendants are subject to the jurisdiction of a Florida court. *See Avicolli v. BJ's Wholesale Club, Inc.*, 2021 WL 3471167, at *3 (E.D. Pa. Aug. 6, 2021) (holding a "defendant is properly subject to jurisdiction in a state where it seeks to serve that state's market.")

151.    Ms. Harrell has made thousands of dollars of payments to Path Lending for the null, void, and unenforceable loans made to her at triple-digit interest rates.

152.    Ms. Harrell has been damaged in that she has paid one or more of the Defendants for loans that were void and criminally usurious pursuant to Florida law.

153.    Ms. Harrell also suffered emotional distress as a result of the Defendants' attempts to collect an unenforceable debt.

154.    Ms. Harrell has hired the aforementioned law firm to represent her in this matter and has assigned her right to fees and costs to such firm.

**COUNT I**
**VIOLATIONS OF THE FCCPA, § 559.72(9), FLA. STAT.**
**Path Lending and Thunderbird**

155.    Ms. Harrell adopts and incorporates Paragraphs 1 – 154 as if fully restated herein.

156.    Path Lending and Thunderbird violated **§ 559.72(9), Fla. Stat.**, when they attempted to collect – and did collect – a loan made to Ms. Harrell by Path Lending, therein asserting the legal right to collect such loan.

157.    The Loan was illegitimate and unenforceable due to the application of interest rates in excess of 700% annually on the principal amount of the loan, in violation of § 687.071, Fla. Stat., and the Defendants knew, or should have known, the loan was unenforceable in Florida.

158.    The actions of Path Lending and Thunderbird were willful, intentional, and done for the express purpose of collecting an unenforceable debt from Plaintiff and profiting from such collection.

159.    Path Lending and Thunderbird each knew of the illegal nature of the Loan, as the Defendants have gone to great lengths to attempt to avoid Florida law through use of a "rent-a-tribe" scheme.

**WHEREFORE,** Ms. Harrell respectfully requests this Honorable Court enter judgment against Path Lending and Thunderbird, jointly and severally, ordering:

a.  Statutory damages of **$1,000.00**, pursuant to § 559.77(2), Fla. Stat.;

b.  Actual damages, pursuant to § 559.77(2), Fla. Stat.;

c. Injunctive relief preventing the Defendants from attempting to collect alleged loan balance from Ms. Harrell made at unlawful rates, pursuant to § 559.77(2), Fla. Stat.;

d. Reasonable costs and attorney's fees pursuant to § 559.77(2), Fla. Stat.; and,

e. Such other relief that this Court deems just and proper.

**COUNT II**
**VIOLATIONS OF RICO, 18 U.S.C. § 1962(c)**

160.    Ms. Harrell adopts and incorporates Paragraphs 1 – 154 as if fully restated herein.

161.    The Defendants, through their participation in the furtherance of the Path Lending Loans scheme, along with the Tribe, and other persons, natural and otherwise, constitute an *Enterprise* as defined by 18 U.S.C. § 1961(4).

162.    The Loans charged interest rates far in excess of Florida's maximum permitted rate, and thus the Loans were *Unlawful Debts* pursuant to 18 U.S.C. § 1961(6).

163.    The Defendants each associated with the enterprise and participated in the affairs of the enterprise as described in detail herein, which existed for the purpose of collection of unlawful debt.

164.    The Defendants' participation in the enterprise violated **18 U.S.C § 1962(c)** and caused Ms. Harrell to repay an amount on the unlawful Loan.

**WHEREFORE,** Ms. Harrell respectfully requests this Honorable Court enter judgment against the Defendants, jointly and severally, ordering:

a.  Threefold the amount of actual damages;

b.  Reasonable costs and attorneys' fees pursuant to 18 U.S.C § 1964(c);

c.  Any other relief this Court deems equitable and proper under the circumstances.

**COUNT III**
**VIOLATIONS OF RICO, 18 U.S.C § 1962(d)**

165.  Ms. Harrell adopts and incorporates Paragraphs 1 – 154 as if fully restated herein.

166.  The Defendants, through their participation in the furtherance of the Path Lending Loans scheme, along with the Tribe, and other persons, natural and otherwise, constitute an *Enterprise* as defined by 18 U.S.C. § 1961(4).

167.  The Loans charged interest rates far in excess of Florida's maximum permitted rate, and thus the Loans were *Unlawful Debts* pursuant to 18 U.S.C. § 1961(6).

168.  The Defendants violated **18 U.S.C § 1962(d)** by conspiring with each other, and other entities and individuals, to issue and collect unlawful debts through Path Lending.

169.  The Defendants were each aware of the goals of the enterprise and each took actions in furtherance of this conspiracy. For example, at various times,

the Defendants have: (a) issued the Loans to Ms. Harrell; (b) requested and obtained consumer credit reports regarding Ms. Harrell; (c) sold consumer credit reports regarding Ms. Harrell to assist with review of her loan application; (d) initiated ACH deposits and withdrawals to and from Ms. Harrell's bank account; (e) collected loan payments and usurious interest; (f) reported Ms. Harrell's Loans to Clarity; and, (g) incorporated tradeline data regarding the Loans in reports sold regarding Ms. Harrell.

170.   The Defendants each agreed to participate in the conspiracy and agreed to the overall objective of the conspiracy – to collect unlawful loans through Path Lending Loans.

**WHEREFORE,** Ms. Harrell respectfully requests this Honorable Court enter judgment against the Defendants, jointly and severally, ordering:

a.   Threefold the amount of actual damages;

b.   Reasonable costs and attorneys' fees pursuant to 18 U.S.C § 1964(c);

c.   Any other relief this Court deems equitable and proper under the circumstances.

**COUNT IV**
**VIOLATIONS OF THE CRCPA, § 772.103(3), FLA. STAT.**

171.   Ms. Harrell adopts and incorporates Paragraphs 1 – 154 as if fully restated herein.

172.   The Defendants, through their participation in the furtherance of the Path Lending scheme, along with the Tribe, and other persons, natural and otherwise, constitute an *Enterprise* under the CRCPA, § 772.102(3), Fla. Stat.

173.   The Loans made to Ms. Harrell through Path Lending charged interest rates far in excess of Florida's maximum permitted rate, pursuant to § 687.071(3), Fla. Stat.

174.   Thus, the Loans were *Unlawful Debts* pursuant to § 772.102(2)(a)(3), Fla. Stat.

175.   Violations of Chapter 687, Fla. Stat., amount to *Criminal Activity* as defined in § 772.101(1)(a), Fla. Stat.

176.   The Defendants each associated with the enterprise and participated in the affairs of the enterprise as described in detail herein, which existed for the purpose of collection of unlawful debt and demonstrated a pattern of criminal activity.

177.   The Defendants each participated in this conspiracy. Path Lending, Thunderbird, and Milks operated PathLending.com, and Clarity provided the consumer data necessary for its operation.

178.   The Defendants' participation in the enterprise violated **§ 772.103(3), Fla. Stat.,** and caused Ms. Harrell to repay an amount on the unlawful Loans from Path Lending.

**WHEREFORE,** Ms. Harrell respectfully requests this Honorable Court enter judgment against the Defendants, jointly and severally, ordering:

a.     Threefold the amount of actual damages or, in the alternate, the statutory minimum of **$200**, whichever is greater, pursuant to § 772.104(1), Fla. Stat.;

b.     Reasonable costs and attorneys' fees pursuant to § 772.104(1), Fla. Stat.; and,

c.     Any other relief this Court deems equitable and proper under the circumstances.

## COUNT V
## VIOLATIONS OF THE CRCPA, § 772.103(4), FLA. STAT.

179.   Ms. Harrell adopts and incorporates Paragraphs 1 – 154 as if fully restated herein.

180.   The Defendants, through their participation in the furtherance of the Path Lending scheme, along with the Tribe, and other persons, natural and otherwise, constitute an *Enterprise* under the CRCPA, § 772.102(3), Fla. Stat.

181.   As described in detail herein, the Defendants are a group of individuals and entities associated in fact, although they are not a single legal entity. Particularly, Path Lending, Thunderbird, and Milks operated essential functions of PathLending.com. Clarity is associated in fact by virtue of its ongoing business relationship with Path Lending, whereby it provides the underlying data

necessary for Path Lending to evaluate potential borrowers for its high interest rate loans and publishes information about payment history concerning these loans in credit reports it sells.

182.   The Loans made to Ms. Harrell through Path Lending charged interest rates far in excess of Florida's maximum permitted rate, pursuant to § 687.071(3), Fla. Stat.

183.   Thus, the Loans were *Unlawful Debts* pursuant to § 772.102(2)(a)(3), Fla. Stat.

184.   Violations of Chapter 687, Fla. Stat., amount to *Criminal Activity* as defined in § 772.101(1)(a), Fla. Stat.

185.   The Loans to Ms. Harrell demonstrate a pattern of illegal loans issued to Florida consumers by Path Lending.

186.   The Defendants violated **§ 772.103(4), Fla. Stat.,** by conspiring with each other, and other entities and individuals, to issue and collect unlawful debts through Path Lending.

187.   The Defendants were each aware of the goals of the enterprise and each took actions in furtherance of this conspiracy. For example, at various times, the Defendants have: (a) issued the Loans to Ms. Harrell; (b) requested and obtained consumer credit reports regarding Ms. Harrell; (c) sold consumer credit reports regarding Ms. Harrell to assist with review of her loan applications; (d) initiated ACH deposits and withdrawals to and from Ms. Harrell's bank account;

(e) collected Loan payments and usurious interest; (f) reported Ms. Harrell's Loans to Clarity; and, (g) incorporated tradeline data regarding the Loans in reports sold regarding Ms. Harrell.

188.   The Defendants each agreed to participate in the conspiracy and agreed to the overall objective of the conspiracy – to collect unlawful loans through Path Lending.

**WHEREFORE,** Ms. Harrell respectfully requests this Honorable Court enter judgment against the Defendants, jointly and severally, ordering:

a.   Threefold the amount of actual damages, or in the alternate, the statutory minimum of **$200**, whichever is greater, pursuant to § 772.104(1), Fla. Stat.;

b.   Reasonable costs and attorneys' fees pursuant to § 772.104(1), Fla. Stat.; and,

c.   Any other relief this Court deems equitable and proper under the circumstances.

**COUNT VI**
**VIOLATIONS OF THE EFTA, 15 U.S.C. § 1693k(1)**
**Path Lending and Thunderbird**

189.   Ms. Harrell adopts and incorporates paragraphs 1 – 154 as if fully stated herein.

190.   Path Lending, via Thunderbird, violated **15 U.S.C. § 1693k(1),** either willfully and intentionally, or recklessly and without regard for a consumer's

rights, when they conditioned the approval of a loan upon Ms. Harrell agreeing to electronic payments, with her only real recourse being to modify such agreement after the loan was originated.

**WHEREFORE,** Ms. Harrell respectfully requests this Honorable Court enter judgment against Path Lending and Thunderbird, jointly and severally, ordering:

a.   Actual damages pursuant to 15 U.S.C. § 1693m(1);

b.   Statutory damages of $1,000.00, pursuant to 15 U.S.C. § 1693m(a)(2)(A);

c.   Reasonable costs and attorneys' fees, pursuant to 15 U.S.C. § 1693m(a)(3); and,

d.   Such other relief that this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Ms. Harrell hereby demands a jury trial on all issues so triable.

Respectfully submitted this August 12, 2024 by:

**SERAPH LEGAL, P. A.**

*/s/ Brandon D. Morgan*
Brandon D. Morgan, Esq.
Florida Bar Number: 1015954
BMorgan@SeraphLegal.com
Thomas M. Bonan, Esq.
Florida Bar Number: 118103
TBonan@SeraphLegal.com
2124 W Kennedy Blvd., Suite A
Tampa, FL 33606
Tel: 813-567-3434
Fax: 855-500-0705
*Counsel for Plaintiff*

## ATTACHED EXHIBIT LIST

A  Ms. Harrell's Loan Agreement with Path Lending, August 31, 2023 - Excerpt
B  Ms. Harrell's Clarity Consumer Report, July 26, 2024, Excerpts
C  PathLending.com, Excerpt